## In re BEAUNIT MILLS, INC.

### Patent Appeals No. 6418.

United States Court of Customs
and Patent Appeals.
Dec. 15, 1959.
Rehearing Denied Feb. 18, 1960.

Worley, C. J., and Martin, J., dissented.

---

Rudolph S. Bley, Elizabethton, Tenn. (Charles R. Allen, Jr., Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C., for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge.

This appeal is from the decision of the Commissioner of Patents sustain-

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of* *Judge O'Connell,* pursuant to provisions of section 294(d), Title 28 United States Code.

ing the examiner's final refusal to register the trademark "Cultured Bemberg." The application drawing depicts those two words in white arranged one above the other on a black oval background. Nothing else appears on the drawing or the specimen accompanying the application. The goods enumerated in the application are "woven, knitted, netted, textile, and pile fabrics in the piece, comprised of rayon, or in substantial part of rayon combined with cotton, wool, silk, nylon, and other synthetic fibers."

The sole ground of rejection is predicated on section 2(d) of the Trade-Mark Act of 1946 (the Lanham Act) 15 U.S. C.A. § 1052(d), which requires the Patent Office to refuse registration to any trademark which

"(d) consists of or comprises a mark which so resembles a mark registered in the Patent Office * *, as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive purchasers * * *."

■ Appellant's application, serial No. 689,801, filed June 20, 1955, claims May 16, 1955, as the date of first use. The Patent Office has rejected the application because of the prior registration, on the Principal Register, of "Cultured Cotton" for "cotton textile fabrics in the piece," registration No. 604,522 of April 12, 1955. Both the examiner and the Commissioner were of the opinion that registration was proscribed by section 2(d), the opinion of the Commissioner, acting through Assistant Commissioner Leeds, concluding as follows:

" 'Cultured,' when applied to fabrics, represents an arbitrary use of an ordinary word. Applicant's use of the word will, I believe, inevitably cause purchasers to assume that the fabrics marked 'Cultured Bemberg' and 'Cultured Cotton' emanate from a single source * * *."

Considering the diverse reactions of purchasers to the psychological impact of trademarks, it is perhaps going too far to say that they will inevitably react in any particular way; but we do agree with the conclusion to the extent that it is "likely" that purchasers will be confused or mistaken or deceived as to the source of the goods. No more than that is required to sustain the refusal to register. If the intention was to say that some confusion would be inevitable, we fully agree.

Appellant has attacked the conclusion in various ways and on various grounds, none of which has convinced us that it is wrong. We shall comment briefly on them.

First, appellant urges us to regard "Cultured" as descriptive (or at least highly suggestive) and to regard "Bemberg" as the dominant feature of its mark, emphasizing that the latter has been promoted with six million dollars worth of advertising since 1930 and that what it is really trying to do here is to obtain an additional registration of its "Bemberg" mark, admittedly already registered ten times for piece goods, "in the form as actually used upon its goods in commerce." Answering this we would point out that it has not been shown in what way "Cultured" is descriptive of piece goods, that some of the best trademarks are those which are highly suggestive and that what is here sought to be registered is not "Bemberg" but "Cultured Bemberg" and it is registrability of the latter which is at issue.

Appellant, with its brief on appeal to the Commissioner, offered to file a disclaimer (not entered and still, therefore, merely an offer) of the word "Cultured," apart from the mark as shown. Appellant admits in its brief that "for the purpose of this proceeding, it is immaterial whether or not the word 'Cultured' is disclaimed apart from its applied-for mark by applicant, or whether such term is considered descriptive." Although appellant also urges in its brief that the disclaimer should be entered, it seems itself to have disposed of any argument that might be based on disclaimer by admitting its immateriality. In any case, disclaimer of any exclusive right to one of the words of a two word trade-

mark, "apart from the mark as shown," does not affect the fact that it is the two words *together* that *constitute* the trademark sought to be registered. This mark must be considered as a whole on the issue of likelihood of confusion.

Another line of argument is based on the specimen label which was filed with the application to register "Cultured Cotton," which label bears another trademark, "Ruby Set." Appellant argues that the prior registrant's goods would be identified by the latter mark and that "Cultured Cotton" is a "secondary mark and is not a primary origin indicator." This argument is coupled with the contention that appellant's "dominant trademark" is "Bemberg" and it is then stated "that there is no similarity between the dominant trademarks employed by the respective parties, namely 'Bemberg' and 'Ruby Set'."

We decline to be led away from the only issue before us which is the registrability of "Cultured Bemberg" in view of the prior registration of "Cultured Cotton." We are in no way here concerned either with the trademark "Ruby Set" or with the specimen label on which it appears. It is not the label that was registered. The language of the statute is specific. We are concerned only with a prior registration which was granted for the trademark "Cultured Cotton" and the proposed registration of "Cultured Bemberg" and nothing else. This court has rejected similar arguments several times in the past. See Burton-Dixie Corp. v. Restonic Corp., 234 F.2d 668, 43 CCPA 950, and cases therein cited.

Another argument is that appellant is here seeking only to have its application for registration passed for publication for opposition purposes and that this court should reverse so that this may be done, leaving it to the future to see whether the owner of the "Cultured Cotton" registration will file an opposition. We are told that in such an opposition the registrant could show a number of facts as to how it is actually using its mark so that the Patent Office would not have to base its decision "on pure hypothesis." Part of the answer to this is supplied by appellant's own admission that "the Patent Office has the duty to refuse to register a mark which so resembles a mark previously registered in the Patent Office, or a mark previously used in the United States, as to be likely to cause confusion or mistake or to deceive purchasers." So far as the office is concerned, passing a mark for publication is tantamount to granting the registration. The rest of the answer is that if the prior registrant did oppose, it would be entitled to stand on its registration if it wished, thus presenting the Patent Office with the identical issue it has already decided and, furthermore, if by "pure hypothesis" appellant means a subjective opinion as to a state of affairs not established by proof, the duty of forming such opinions is, unhappily, imposed on the Patent Office and this court by statute.

Appellant attempts to draw a parallel between the present case and this court's opinion in Hart Schaffner & Marx v. Empire Manufacturing Co., 197 F.2d 558, 39 CCPA 1042, while conceding that "prior decisions are of little value and each case must be decided on its own set of facts, North Star Mfg. Co. v. Wells Lamont Corp., 193 F.2d 204, 39 CCPA 764." Though some superficial similarities can be noted, they appear to be exceeded by significant differences. Notably, appellant has glossed over the fact that in that contested opposition the applicant's mark "Dixie Leader," was for overalls and similar work clothes while the well-known opposer, Hart Schaffner & Marx, based its opposition on the trademark "Dixie Weave" for men's suits of a porous weave for hot weather wear. The court obviously felt the differences in the merchandise were most significant on the issue of likelihood of confusion as to origin. The merchandise of both the applicant and prior registrant here is piece goods.

Finally, appellant claims that "the goods of the parties here are normally purchased with considerable care." (Of course, there is only one party, the appli-

cant.) Among the purchasers appellant includes all "housewives normally skilled in the sewing arts." We would expect, as the Patent Office Solicitor has pointed out, that this class of purchasers would be an extensive group including all shades of literacy, intelligence and education, not exactly a class of "discriminating purchasers" in the usual trademark sense of that term. Surely, while this group as a whole will appreciate that cotton and Bemberg—and also rayon, nylon and silk—are different *fabrics*, it is likely, in our opinion, that many, if not most, of the group would not know that "Bemberg" is a trademark and that rayon and nylon are not trademarks. They are as likely to think that "Bemberg" is a kind of cloth, as indeed it appears to be, as a species of rayon or artificial silk;[1] so thinking, they are likely to believe that cotton piece goods and artificial silk piece goods both marketed under the name "Cultured" emanate from a common source.

In saying that "Bemberg" is a kind of cloth we do not intend to detract from its value, importance or legal significance as a trademark. More accurately we should probably say it is a family of cloths and yarns, but yarns are not involved here. The point we wish to make is that many in the class of people who buy "Bemberg" piece goods are not trademark sophisticates and in making a "pure hypothesis" about the likelihood of confusion or mistake as to origin we cannot assume them to be such. For this reason we have not been swayed by the $6,000,000 spent since 1930 in advertising "Bemberg" products or by the ten prior registrations of that mark.

The decision of the Commissioner of Patents is affirmed.

Affirmed.

WORLEY, Chief Judge (dissenting).

I agree with the majority that competing marks should be considered in their entirety, but respectfully suggest the emphasis here on the word "cultured" virtually nullifies that test and results in the tail wagging the dog.

It would be difficult to imagine two words in the trademark world more unlike than "Bemberg" and "Cotton." They do not look alike, sound alike, or create the same impression. They differ in length and in spelling, with no letter of the alphabet in common. They differ in meaning and are used on different fabrics. How, then, can an ordinary word like "cultured" be endowed with such strength as to overcome the sharp differences between "Bemberg" and "Cotton," and so dilute them as to create a likelihood of confusion where none could possibly have existed before? Although that question is vital to the issue here, there seems to be no unanimity as to exactly why such is the case. The examiner said the word was "fanciful and arbitrary;" the Assistant Commissioner said it was "an arbitrary use of an ordinary word;" the applicant strongly contends that it is descriptive, or at least highly suggestive; yet the majority does not say expressly what it is, but holds that appellant has not proved its contentions.

I find nothing in the definition of the word "culture"[1] or its proposed use by appellant to support the unusual veto power accorded it. It is not a coined

---

1. Even if the technically minded should look for the meaning of the word in the "Condensed Chemical Dictionary," 4th Ed., they would find: "bemberg. See copper ammonium rayon," and under the latter, "Bemberg, Pauly rayon; glanzstoff." Hackh's Chemical Dictionary, 3rd Ed., says: "Bemberg silk. An artificial silk made by the cuprammonium process." Concise Chemical and Technical Dictionary, Bennett ed. 1947, says: "Bemberg yarn. Trade name for a cuprammonium rayon."

1. Webster's New International Dictionary, 1949.

"1. a Art or practice of cultivating; manner or method of cultivating; tillage.

\* \* \* \* \*

"b *Obs.* Cultivated land; a cultivated area.

2. Act of developing by education, discipline, etc.; the training or refining of the moral and intellectual nature.

\* \* \* \* \*

"3. a The cultivation or rearing of a particular product or crop, or stock for

word, but one belonging in the public domain; as such its use should not be denied those in the trademark world without sounder reasons than those advanced here. Indeed, in view of the sharp contrast between "Bemberg" and "Cotton" it is not unreasonable to suppose that denial of appellant's application would vest in the prior registrant a virtual monopoly of the word "cultured," at least in the textile field. In my opinion we are sorely underestimating the intelligence of the average purchaser in holding that concurrent use of the instant marks would be likely to result in confusion, especially since it is reasonable to assume that the average purchaser of the instant fabrics in the piece would be expected to exercise at least some degree of selectivity.

I would reverse.

MARTIN, J., concurs in dissent.

supply; as, the *culture* of the vine; bee, fish, or oyster *culture*.

"b Consecutive endeavor at improvement of or in a special line; as, *culture* of the sonnet. c The business or profession of giving expert care or training; as *beauty* culture; *voice* culture.

"4. a The state of being cultivated; esp., the enlightenment and refinement of taste acquired by intellectual and aesthetic training; the intellectual content of civilization; refinement in manners, taste, thought, etc.

"b Conversance with and taste in fine arts, humanities, and broad aspects of science;—distinguished from vocational, technical, or professional skill or knowledge. 5. a A particular state or stage of advancement in civilization or the characteristic features of such a stage or state; as, primitive, Greek, Germanic *culture*. b The complex of distinctive attainments, beliefs, traditions, etc., constituting the background of a racial, religious, or social group; as, a nation with many *cultures*. Phrases in this sense are:

| | | |
|---|---|---|
| culture area | culture mixing | culture sequence |
| culture center | culture pattern | culture stage |
| culture complex | culture phenomenon | culture trait. |

"6. *Anthropol.* The trait complex manifested by a tribe or a separate unit of mankind. 7. *Biol.* Cultivation of microorganisms, as bacteria, or of tissues, fungi, etc., in prepared nutrient media; also, an instance of such cultivation, or esp. a growth which is the intended product of it; by extension, any inoculated nutrient medium. See MEDIUM. 7. a; PURE CULTURE. Phrases are: culture flask, culture fluid, culture organism, culture plate. 8. *Cartography.* Those details of a map which represent culture features, meridians parallels, etc. Sny.—See civilization.

"Culture. 1. To cultivate.

\* \* \* \* \*

2. *Bacteriol. & Biol.* a to grow (microorganisms, tissues, etc.) in a culture. b To inoculate with a culture, as of bacteria, or to treat as a culture; as, *cultured* milk."